Charles ALLISON, Plaintiff,

v.

Lawrence E. WILSON, Warden, San Quentin State Prison, R. J. Thomas, Correctional Officer, P. G. Hayes, Correctional Officer, the State of California et al., Defendants.

Civ. No. 45594.

United States District Court
N. D. California.

Dec. 1, 1967.

Thomas C. Lynch, Atty. Gen. of State of California, San Francisco, Cal., Derald E. Granberg and Charles R. B. Kirk, Deputy Attys. Gen., for defendants.

Charles Allison, in pro. per.

## ORDER DENYING PLAINTIFF'S MOTION FOR APPOINTMENT OF COUNSEL

WOLLENBERG, District Judge.

Plaintiff, an inmate at San Quentin State Prison, has filed a complaint under provisions of the Civil Rights Act (42 U.S.C. § 1983) alleging that he has suffered back injuries at the hands of certain correctional officers of the institution and asking damages. He has now moved this Court for the appointment of counsel based upon his indigence.

The present suit is one of five of a series of suits brought by plaintiff under the Civil Rights Act against various persons engaged in the administration of justice. On August 29, 1966, plaintiff filed in this Court an action (Civil No. 45583) brought against the Warden at San Quentin, a judge of the Marin County Superior Court, the presiding justice of a division of the California Court of Appeal, and all of the justices composing the California Supreme Court. The gravamen of the complaint, wherein plaintiff sought damages, was that the various judicial officers refused to grant him a writ of habeas corpus, resulting in his "unlawful" incarceration. The suit was dismissed on November 21, 1966.

On October 28, 1966, plaintiff filed in this · Court a "Peace Bond Pending Amended Complaint" (Civil No. 45684). This document, which intimated that plaintiff was in the process of preparing an amended complaint, alleged that certain correctional officers at San Quentin had illegally subjected plaintiff and his cell to an unauthorized search, taken legal documents from him, jerked his hand, and "put a flashlight in plaintiff's side." Plaintiff has filed no further papers in that case.

The present suit, filed on March 1, 1967, alleges that certain correctional officers at San Quentin slammed plaintiff's cell door shut upon him and also jerked plaintiff's feet out from under him as a result of which plaintiff has sustained injuries to his back for which he seeks compensatory damages.

On May 19, 1967, plaintiff filed suit in the United States District Court for the District of Nevada (No. 1952–N) against a county sheriff, a deputy sheriff, and certain local police officers, alleging that he had been "hit in the face," and "beat[en], kicked, stomped, thrashed, and cursed." He further alleged that "defendants did intentionally and maliciously assault and batter the plaintiff by striking him with their fists, throwing him violently to the floor, kicking him about [the] neck and chest with their feet as plaintiff lay on the floor with his hands handcuffed behind his back, and as a result he was injured in his head, chest and back." In that case, which is still pending, plaintiff has asked for damages in the sum of $300,000.

On July 3, 1967, plaintiff filed a complaint in this Court (Civil No. 47376) alleging that certain correctional officers at San Quentin had "conspired" to deprive him of prison privileges and that some of them had committed an assault upon him during which one of his teeth was broken off. Plaintiff again sought compensatory damages.

Further insight into this series of suits is supplied by various affidavits and exhibits which have been filed in some of these cases. In plaintiff's fifth suit (Civil No. 47376), affidavits filed by Correctional Officers Perkins and White reveal that during a routine patrol of their assigned sector they discovered the following sign attached to the bunk of the cell in which plaintiff was the sole occupant:

"ATTORNEY AT LAW, CIVIL COMPLAINTS, WRITS, ETC. OFFICE HOURS 8:00 to 4:00."

The legal papers of five other inmates were also found in plaintiff's cell. In that same suit, as an exhibit filed on November 7, 1967, this Court was furnished with a copy of a letter written by the Chief Dental Officer at San Quentin which indicated that X-rays of plaintiff's teeth revealed that none were broken. In the present case, as an exhibit filed on April 14, 1967, this Court was furnished with a copy of a letter written by the

Chief Medical Officer and another doctor which indicated that plaintiff's symptoms had begun before the alleged incident and that there was "scant evidence of anything more than a common minor muscular complaint which is directly related often to the mental attitude of the patient."

In light of these five suits, the nature of the complaints and allegations, and the exhibits and affidavits produced in response to plaintiff's various claims, it is apparent to me that plaintiff's suit herein is part of a patently vindictive scheme to utilize the provisions of the Civil Rights Act for the purpose of harassing law enforcement officials and other persons who are part of the administration of justice, and that there is a substantial likelihood that the allegations of fact are false.

"In contrast to a criminal proceeding, in which the court has a duty to 'assign' counsel to represent a defendant in accordance with his Constitutional right, * * * the court in a civil case has the statutory power only to 'request an attorney to represent' a person unable to employ counsel. Title 28, U.S.C.A. § 1915(d)." Reid v. Charney, 235 F.2d 47 (6th Cir. 1956).

The appointment of counsel in a case brought under provisions of the Civil Rights Act is discretionary, and a request for such appointment may be denied where the case appears to be without merit. Muhammad v. McGinnis, 362 F. 2d 587 (2d Cir. 1966); Miller v. Pleasure, 296 F.2d 283, 284 (2d Cir. 1961), cert. denied, 370 U.S. 964, 82 S.Ct. 1592, 8 L.Ed.2d 830 (1962); Miller v. Miller, 296 F.2d 283 (2d Cir. 1961), cert. denied, 370 U.S. 963, 82 S.Ct. 1591, 8 L.Ed.2d 830 (1962). The purpose of Title 28, United States Code, section 1915(d), was to permit persons unable to pay an attorney to bring or defend actions for the protection of their rights with the aid of court-appointed counsel, but the courts should not assist indigent persons with the abuse of the judicial process by enabling them to prosecute suits which are frivolous or malicious with appointed counsel. Whe-

lan v. Manhattan Ry. Co., 86 F. 219, 220 (S.D.N.Y.1898); see Cole v. Smith, 344 F.2d 721, 723 (8th Cir. 1965); Fletcher v. Young, 222 F.2d 222, 224 (4th Cir.), cert. denied, 350 U.S. 916, 76 S.Ct. 201, 100 L.Ed. 802 (1955).

In exercising its discretion to appoint counsel for an indigent litigant in a civil suit, the court must weigh many aspects of the case which are usually considered by an attorney instead of the court. In ordinary civil suits, an indigent plaintiff can secure representation only upon a contingent fee basis and an attorney does not accept a case unless he is satisfied that there is both a reasonable basis for suit and a reasonable possibility of success. Thus, the ordinary situation permits a natural process of elimination to winnow bona fide and meritorious cases for those which are sham and meritless. By virtue of court appointment, however, an attorney is obliged by his professional responsibility to bring the issue to trial regardless of merit, and he cannot exercise that independent judgment as to merit which otherwise obtains. Canon 30 of the American Bar Association's Canons of Professional Ethics provides, in part, that "The lawyer must decline to conduct a civil cause or to make a defense when convinced that it is intended merely to harass or to injure the opposite party or to work oppression or wrong." Since this prescript cannot be followed by court-appointed counsel, it is incumbent upon the court to examine the issue and, as a prerequisite to the appointment of counsel, determine whether the particular case patently appears to be frivolous and malicious.

When an indigent civil litigant applies for appointed counsel, that is the proper time for the court to make this examination. See Muhammad v. McGinnis, 362 F.2d 587 (2d Cir. 1966); Miller v. Pleasure, 296 F.2d 283, 284 (2d Cir. 1961), cert. denied, 370 U.S. 964, 82 S.Ct. 1592 (1962); cf. United States v. Leser, 233 F.Supp. 535, 538 (S.D.Cal.1964), remanded on the grounds, 335 F.2d 832 (9th Cir. 1964), cert. denied, 379 U.S. 983, 85

S.Ct. 692, 13 L.Ed.2d 574 (1965). This court cannot, of course, require an attorney to serve an indigent client under court appointment when that attorney finds the cause without merit and seeks to withdraw. United States v. Leser, supra, 233 F.Supp. at 538. But were this Court to mechanically appoint an attorney and ask him to conscientiously examine the files and records of the case and then at that point permit him to withdraw, the attorney would receive no monetary compensation for his time. Morris v. United States, 101 U.S.App.D.C. 296, 248 F.2d 618, 620 (1957); Whelan v. Manhattan Ry. Co., 86 F. 219, 220–221 (S.D.N.Y. 1898). Nor would counsel find his compensation in the satisfaction that he had provided valuable assistance to the Court, his profession, and the society which they serve where withdrawal is prompted by a realization that the cause is frivolous and malicious. After examining the nature of the complaints and allegations in plaintiff's five suits, and the exhibits and affidavits produced in response to plaintiff's various claims, this observation made in Miller v. Pleasure, supra, 296 F. 2d at 285, seems particularly pertinent: "The chances of any measure of success for the plaintiff's claims are so highly dubious that a judge cannot properly ask a member of the bar to assume this thankless burden."

■■ In Roberts v. Barbosa, 227 F. Supp. 20, 21 (S.D.Cal.1964), the court noted:

"[P]ersons convicted of crimes and in the custody of their jailers do not look upon the case of Monroe v. Pape (1961) 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492, and numerous other cases decided by the Supreme Court concerning civil rights, as a pronouncement of principles for the redress of genuine grievances or wrongs, but rather as a blackjack to be used indiscriminately, maliciously, and at will to harass and annoy not only their jailers, but Judges, Jurors, witnesses and everyone having anything to do with their conviction."

"Nor can courts brush aside the fact that as to both prisoners and those not confined, in a *forma pauperis* proceeding, there will be no recourse to defendants even for costs, against plaintiffs, for ill-conceived and malicious and unfounded suits, to say nothing of the trouble, harassment, time, and expense such as attorney fees incurred or expended in defending a suit, which cannot be covered by an assessment for costs." Id. at 23.

Thus it appears that the District Court has not only an obligation to an indigent plaintiff, but a duty towards parties defendant under the Civil Rights Act such that they will not be needlessly subjected to malicious and vindictive suits which are without substantial merit and designed to harass law enforcement officials. Weller v. Dickson, 314 F.2d 598, 601–604 (9th Cir. 1963) (Duniway, J., concurring); ibid. This duty can best be discharged by declining to appoint counsel in those cases where the action brought is patently frivolous and clearly appears to be part of a scheme of malicious harassment.

In addition, this Court is cognizant of problems peculiar to the imprisoned plaintiff, the effects of which cannot be ignored. In Edgerly v. Kennelly, 215 F. 2d 420 (7th Cir. 1954), cert. denied, 348 U.S. 938, 75 S.Ct. 359, 99 L.Ed. 735 (1955), a prisoner had commenced a Civil Rights suit against police officers in the City of Chicago alleging that they committed certain brutal acts upon him. He was confined in the Federal Penitentiary at Alcatraz and sought a writ of *habeas corpus ad testificandum* in order that he might be returned to Chicago and deposed. The court first distinguished habeas corpus proceedings designed to secure a prisoner's release from unconstitutional custody from civil suits insofar as the necessity of the prisoner's appearance in court was concerned. Id. at 422–423. The court then observed:

"Plaintiff asserts somewhat vaguely that the refusal to require his production as a witness was a violation of his constitutional rights. However, we are not aware of any constitutional right where a prisoner lawfully committed has to be produced as a witness either in his own or

some other case in an action for the recovery of damages. It must be remembered that a person in his unfortunate situation is stripped of many of the rights possessed by a free person and guaranteed by the Constitution. As stated in Price v. Johnson, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356: 'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by considerations underlying our penal system." Id. at 423.

In Armstrong v. Rushing, 352 F.2d 836, 837 (9th Cir. 1965), the court noted that "if plaintiff is presently incarcerated in a state prison he is not entitled, as a matter of right, to appear personally at a hearing in this Civil Rights action."

Plaintiff's imprisonment presents problems in regard to the production of his testimony which can only be solved at considerable cost to the federal government. Since he has no right to release from prison for purposes of testifying, the only way in which his testimony can be offered is through deposition. In such a case, a court reporter would be required to travel to and from San Quentin, be present at the questioning and during cross-examination, record all responses of the prisoner, and then transcribe them. In the case of an indigent prisoner, only the federal government would be required to bear those costs. The potential expense to the federal government is further accented by plaintiff's similar Civil Rights complaint now pending in the United States District Court for the District of Nevada. Were the federal government to undertake plaintiff's financial support in the Nevada litigation, it is conceivable that the government would be faced not only by substantial reporter's fees, but by the costs of travel to and from San Quentin by whomsoever might be appointed to represent plaintiff in Nevada, since counsel's personal confrontation with his client is essential to his preparation for the deposition stage.

■ Appointment of counsel to an indigent incarcerated plaintiff in a civil action implicitly authorizes the commitment of federal funds to underwrite necessary expenditures. In some cases, perhaps, such an expense might be justified. But in the present case, the number and tenor of plaintiff's Civil Rights suits are suggestive of harassment and the letters of medical personnel indicate that plaintiff's case is, in all likelihood, without merit. Under these circumstances, this Court must refuse to subject the federal government to the costs of prosecuting this action which subjection is implicit in the appointment of counsel. I cannot give the plaintiff "a field day in the courts, at public expense." Weller v. Dickson, 314 F.2d 598, 601 (9th Cir. 1963).

■ After examination of plaintiff's series of suits, after consideration of the nature of the complaints and allegations therein, and upon review of the exhibits and affidavits produced in response to plaintiff's various claims, it is my conclusion that plaintiff is engaged in a patently vindictive scheme to harass and annoy law enforcement officials with frivolous and malicious suits and that the suit herein is a part of that scheme. I cannot properly ask a member of the bar to assume this thankless burden, nor can I ignore my duty to the defendants to see that they will not be needlessly subjected to malicious and vindictive suits without substantial merit and designed more for harassment than redress. I have also considered the potential costs which would be implicit in the appointment of counsel.

IT IS THEREFORE ORDERED that the motion for appointment of counsel is denied, with leave to plaintiff to proceed as best he can within the limits of his status as a prisoner.